## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GARFIELD KIDNEY CENTER, LLC, | ) | Case No.  13-27092 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | | Hon. Eugene R. Wedoff |

### INTERIM ORDER (A) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE, (B) GRANTING PRIMING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDER PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (C) PROVIDING ADEQUATE PROTECTION TO PREPETITION LENDER; AND (D) SCHEDULING A FINAL HEARING

This matter came before this Court on the motion (the "Motion") of West Side Community Hospital, Inc. d/b/a Sacred Heart Hospital ("Sacred Heart"), Garfield Kidney Center, LLC ("Garfield"), and Superior Home Health, L.L.C. ("Superior," and collectively, the "Debtors" and each individually a "Debtor"):

A. seeking this Court's authorization, pursuant to sections 105, 361, 364(c)(1), 364(c)(2), and 364(d) of chapter 11 of title 11 of the Bankruptcy Code, and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to obtain a priming secured, super-priority debtor-in-possession term loan, as described in the Postpetition Documents in the amount of $410,000.00 from the lender under the Postpetition Documents;

B. requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") be held for this Court to consider entry of this interim order ("Interim Order") authorizing the Debtors, on an interim basis, to immediately borrow such amount of the $410,000 as is immediately necessary to preserve the Debtors' estates (the "Interim DIP Loan Amount"); and

C. requesting that within 30 days of the entry of the Interim Order this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order authorizing the balance of the Postpetition Debt on a final basis, as set forth in the Motion and the Postpetition Documents;

and this Court having examined the Motion and the responses and objections thereto, having considered offers of proof, evidence, and testimony presented at the Interim Hearing held on July _, 2013, and upon the representations of counsel for Debtors and other parties in interest, and

being otherwise fully advised of the relevant facts and circumstances surrounding the Motion, and after due deliberation and consideration and good and sufficient cause appearing therefor,

**IT IS FOUND AND DETERMINED THAT:**

A.    On the Petition Date, Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Debtors' Cases. Debtors have retained possession of their property and continue to operate their businesses as Debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.    The Court has jurisdiction over the Cases and these proceedings pursuant to 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C.    Debtors need to incur Postpetition Debt as provided herein in order to enhance the possibility of maximizing the value of the Debtors' estates.

D.    Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) sufficient to finance their operations or the administration of these Cases. Debtors are likewise unable to obtain credit allowable merely under Bankruptcy Code § 364(c)(1), (c)(2) or (c)(3). Debtors are likewise unable to obtain credit under Bankruptcy Code § 364(d) on terms more favorable than those offered by Postpetition Lender.

E.    The terms of the Postpetition Debt have been negotiated at arm's length, and the Postpetition Debt is being extended in good faith, as that term is used in Bankruptcy Code § 364(e).

F.    The terms and conditions of the Postpetition Documents are fair and reasonable, the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

G.    Under the circumstances of these Cases, this Order is a fair and reasonable response to Debtors' request for Prepetition Lender's consent to the Postpetition Debt, and the entry of this Order is in the best interest of Debtors' estates and their creditors.

H.    The notice provided by Debtors of the Motion, the Interim Hearing, and the entry of this Order satisfy the requirements of Fed. R. Bankr. P. 2002, 4001(b) and (c) and 9014 and Bankruptcy Code §§ 102(1), 363, 364(c) and (d) and were otherwise sufficient and appropriate under the circumstances.

-2-

**WHEREFORE, IT IS HEREBY ORDERED THAT:**

1.    <u>Defined Terms</u>.  Unless otherwise indicated, all capitalized terms used as defined terms herein have the meanings ascribed thereto in <u>Exhibit A</u> attached hereto and by this reference are made a part hereof.

2.    <u>Effect of Order</u>.  This Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully enforceable as of the Petition Date.

3.    <u>Authorization To Incur Postpetition Debt</u>.

(a)    <u>Postpetition Documents</u>.  Debtors are hereby authorized and have agreed to: (1) execute the Postpetition Documents, including all documents that Postpetition Lender finds reasonably necessary to implement the transactions contemplated by the Postpetition Documents; (2) perform their obligations under and comply with all of the terms and provisions of the Postpetition Documents and this Order; and (3) pay the Postpetition Charges, including interest, fees and costs.  Upon execution and delivery thereof, the Postpetition Documents shall constitute valid and binding obligations of Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms of the Motion, the Postpetition Documents, and the terms of this Order, this Order shall govern and control.

(b)    <u>Permitted Uses of Postpetition Debt</u>.  Debtors are authorized and have agreed to incur Postpetition Debt solely in accordance with the terms and provisions of this Order.  If Postpetition Lender advances monies to Debtors and Debtors use such monies other than in accordance with the terms or provisions of this Order, such advances shall be considered Postpetition Debt for purposes of this Order.

(c)    <u>Additional Terms of Postpetition Debt</u>.

(i)    <u>Maximum Amount</u>.  The maximum principal amount of Postpetition Debt outstanding shall not at any time exceed the DIP Commitment.

(ii)    <u>Interest</u>.  An interest fee of $75,000 for the first three months shall be charged to the Debtor for the Postpetition Debt, and $30,000 per month for each month thereafter that the Postpetition Debt remains outstanding. All interest fees are deemed earned as of the

first day of each interest period. Default interest fee shall be as provided in the Postpetition Debt Documents.

(iii) <u>Maturity</u>. The Postpetition Debt shall mature and be due and payable in full by Debtors on the Termination Date.

(d) <u>Superpriority Admin. Expense Status; Postpetition Liens</u>.

(i) The Postpetition Debt is hereby granted superpriority administrative expense status under Bankruptcy Code § 364(c)(1), with priority over all costs and expenses of administration of the Cases that are incurred under Bankruptcy Code §§ 503(b) and 507(b), and the Postpetition Debt is entitled to the protections of Bankruptcy Code § 364(e).

(ii) In addition, Postpetition Lender is hereby granted Postpetition Liens, including Priority Liens against the Postpetition Collateral to secure the Postpetition Debt. The Postpetition Liens, including the Priority Liens against the Postpetition Collateral: (1) pursuant to Bankruptcy Code §§ 364(c)(2) and 364(d), are Priority Liens, without any further action by Debtors or Postpetition Lender and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (2) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Cases.

(iii) Notwithstanding the foregoing, Debtors shall execute and deliver to Postpetition Lender such financing statements, mortgages, instruments and other documents as Postpetition Lender may request from time to time, and any such documents filed by Postpetition Lender shall be deemed filed as of the Petition Date.

(e) <u>Prohibition Against Additional Debt</u>. Debtors will not incur or seek to incur debt secured by a lien which is equal to or superior to the Postpetition Debt or the Postpetition Liens, or which is given superpriority administrative expense status under Bankruptcy Code § 364(c)(1), unless, in addition to the satisfaction of all requirements of Bankruptcy Code § 364: (1) Postpetition Lender has consented to such order; (2) at the time such an order is entered, there is no Postpetition Debt outstanding; or (3) such credit or debt is first used to pay the Postpetiton Debt in full in cash.

4. <u>Adequate Protection of the Asserted Interests of Prepetition Lender</u>. Prepetition Lender is adequately protected as set forth herein to the extent required

-4-

under Bankruptcy Code §§ 361, 362, 363 or 364 (including for any decrease in the value of Prepetition Lender's asserted interests in the Prepetition Collateral from and after the Petition Date). As adequate protection for any diminution in the value of the asserted interest of the Prepetition Lender in the Prepetition Collateral, if any, the Prepetition Lender shall be granted replacement liens to the same extent, amount, priority, validity and enforceability as the Prepetition Liens in the Postpetition Collateral ("Replacement Liens"). The Prepetition Lender's Replacement Liens granted herein are subordinate and subject to the Postpetition Liens granted to Postpetition Lender.

5.        Termination Date; Rights and Remedies.

(a)        Effect of Termination Date.  Unless extended by the Court upon the written agreement of Postpetition Lender, upon the Termination Date without further notice or order of Court, at Postpetition Lender's election, the Postpetition Debt shall be immediately due and payable.

(b)        Rights and Remedies.  Upon three (3) business days' written notice to the Debtors, any Committee and the Office of the United States Trustee after the occurrence of the Termination Date, the automatic stay shall be modified to the extent necessary to permit:  (i) the Postpetition Lender to take possession and dispose of all Postpetition Collateral without further action by the Court; (ii) the Postpetition Lender to exercise all rights and remedies available to it under the Postpetition Documents and applicable nonbankruptcy law; and (iii) the Debtors to cooperate with the Postpetition Lender in the exercise of its rights and remedies under the Postpetition Documents and applicable nonbankruptcy law, including, without limitation, by filing a motion to retain one or more agents to sell, lease or otherwise dispose of the Postpetition Collateral upon the request and subject to terms and conditions acceptable to the Postpetition Lender.

6.        Application of Sale Proceeds.  All proceeds from sales or other dispositions of all or any portion of the Postpetition Collateral other than in the ordinary course shall be remitted to Postpetition Lender to repay the Postpetition Debt pursuant to the terms of the Postpetition Documents, including Section 3.05 thereof, unless otherwise agreed by the Postpetition Lender.

{9006 ORD A0349419.DOC 2}

7.    Indemnification.  Debtors shall indemnify and hold harmless the Postpetition Lender in accordance with the Postpetition Documents.

8.    No Marshaling.    Neither the Postpetition Lender nor the Postpetition Collateral shall be subject to the doctrine of marshaling.

9.    Postpetition Charges.    All Postpetition Charges are hereby approved and shall be promptly paid by Debtors in accordance with this Order and the Postpetition Documents, without need for filing an application with the Court for approval or payment of the Postpetition Charges.

10.    Conflicts Between Order, Motion, and Postpetition Documents. To the extent there exists any conflict among the terms of the Motion, the Postpetition Documents and this Order, this Order shall govern and control.

11.    Modification of Stay.  The automatic stay imposed by Bankruptcy Code § 362 is hereby modified with respect to the Postpetition Lender solely to the extent necessary to effectuate the provisions of this Order.

12.    No Waiver.  Postpetition Lender shall not be deemed to have suspended or waived any of its rights or remedies under this Order, the Postpetition Documents, the Bankruptcy Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of the Postpetition Lender, as applicable, and directed to Debtors.  No failure of the Postpetition Lender to require strict performance by Debtors (or by any Trustee) of any provision of this Order shall waive, affect or diminish any right of the Postpetition Lender thereafter to demand strict compliance and performance therewith, and no delay on the part of the Postpetition Lender in the exercise of any right or remedy under this Order, the Postpetition Documents, the Bankruptcy Code, or applicable nonbankruptcy law shall preclude the exercise of any right or remedy.

13.    "Responsible Person."  By taking any actions pursuant to this Order, Postpetition Lender shall not: (a) be deemed to be in control of the operations or liquidation of Debtors; or (b) be deemed to be acting as a "responsible person" with respect to the operation, management or liquidation of Debtors.

-6-

14.   <u>Release</u>.  Upon the date that the Postpetition Debt is paid in full in cash and prior to the release of the Priority Liens against the Postpetition Collateral, Debtors shall execute and deliver to Postpetition Lender a general release of any and all claims and causes of action that could have been asserted or raised under or in connection with the Postpetition Documents.

15.   <u>Amendments</u>.  Debtors and Postpetition Lenders may enter into amendments or modifications of the Postpetition Documents without further notice and hearing or order of this Court; <u>provided</u>, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party-in-interest and (b) notice of any such amendment or modification is filed with this Court.

16.   <u>Binding Effect</u>.  This Order shall be binding on all parties in interest in the Cases and their respective successors and assigns, including any Trustee, except that any Trustee shall have the right to terminate this Order after notice and a hearing.  If, in accordance with Bankruptcy Code § 364(e), this Order does not become a final nonappealable order, if a Trustee terminates this Order, or if any of the provisions of the Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect: (a) the stipulations, representations, and findings contained in this Order and the relief granted by and the releases contained in this Order; and (b) the priority, validity, enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby with respect to Postpetition Debt incurred prior to the effective date of such termination or subsequent order.  All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Order, and Postpetition Lender shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein, with respect to the Postpetition Debt. Except as otherwise explicitly set forth in this Order, no third party is intended to be, or shall be deemed to be, a third party beneficiary of this Order.

17.   <u>Survival</u>.  The provisions of this Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Cases: (a) confirming any chapter 11 plan, (b) converting any Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing

the Cases, (d) withdrawing of the reference of the Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Cases in this Court. The terms and provisions of this Order, including, without limitation, the rights granted Postpetition Lender under Bankruptcy Code §§ 364(c) and (d), shall continue in full force and effect until all of the Postpetition Debt is indefeasibly paid in full in cash and discharged.

_____

United States Bankruptcy Judge

Dated: July __, 2013

## EXHIBIT A

## DEFINED TERMS

1.      *Bankruptcy Code*.  The United States Bankruptcy Code (11 U.S.C. § 101 *et seq*.), as amended, and any successor statute.  Unless otherwise indicated, all statutory section references in this Order are to the Code.

2.      *Cases*.  The chapter 11 cases or any superseding chapter 7 cases of the Debtors.

3.      *DIP Commitment*.  The amount of $410,000.00.

4.      *Event of Default*.  At Postpetition Lender's election, (a) a Debtor's failure to comply with the covenants or perform any of its obligations in strict accordance with the terms of this Order; and (b) the occurrence and continuance of any "Event of Default" (as that term is defined in the Postpetition Documents).

5.      *Obligations*.  The "Obligations," as that term is defined in the Documents.

6.      *Permitted Priority Liens*.  Collectively, liens in favor of third parties upon the Prepetition Collateral, which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date.

7.      *Person*.  Any natural person, corporation, firm, joint venture, partnership, limited liability company, association, enterprise, trust or other entity or organization, or any government or political subdivision or any agency, department or instrumentality thereof.

8.      *Petition Date*.  July 2, 2013.

9.      *Postpetition Charges*.  Interest at the applicable rate of interest under the Postpetition Documents and all fees, costs, and expenses provided for in the Postpetition Documents, including those incurred by Postpetition Lender in connection with the Postpetition Debt.

10.      *Postpetition Collateral*.  Except as provided in the last sentence of this definition, all of the real and personal property of Debtors of any description whatsoever, wherever located and whenever arising or acquired, including all cash, accounts, inventory, equipment, fixtures, chattel paper, general intangibles (but not including any claims and proceeds under Bankruptcy Code §§ 544, 545, 547, 548, 549, 550, 551, and 553), all leaseholds, all commercial torts, all interests in any joint venture, all liquor licenses and other licenses and permits, and all other "Collateral" (as that term is defined in the Postpetition Documents), and all proceeds, rents, issues, profits and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any of the foregoing.  Notwithstanding the foregoing, Postpetition Collateral shall not include (a) cash in the approximate amount of $5

million allegedly securing the Prepetition Lender's letter of credit in the amount of $5 million; (b) those certain life insurance policies owned by Sacred Heart on the lives of Ed Novak and Roy Payawal; and (c) equipment subject to a true lease or equipment subject to valid, enforceable and perfected security interest existing as of the Petition Date other than the liens of FirstMerit Bank, N.A.

11.    *Postpetition Debt*.    All indebtedness or obligations of Debtors to Postpetition Lender incurred on or after the Petition Date pursuant to this Order or otherwise, including all Obligations.

12.    *Postpetition Documents*.    The Loan and Security Agreement by and between Debtors and Postpetition Lender, as amended, modified, supplemented, replaced or refinanced from time to time, a copy of which is attached to this Order as Exhibit B, and the "Loan Documents" (as that term is defined in the Loan and Security Agreement attached as Exhibit B).

13.    *Postpetition Lender*.    BCL-M&E LLC.

14.    *Postpetition Liens*.    Priority Liens in the Postpetition Collateral.

15.    *Prepetition Collateral*.    All of the "Collateral" (as that term is defined in the Prepetition Documents) existing as of the Petition Date.

16.    *Prepetition Debt*.    (a) All indebtedness or obligations under the Prepetition Documents as of the Petition Date, including all Obligations under the Prepetition Documents, and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Documents.

17.    *Prepetition Documents*.    The Reimbursement Agreement dated as of May 25, 2012, between FirstMerit Bank, N.A., Bentley Management Group, LLC, BMG Management, LC, West Side Community Hospital, Inc., Garfield Kidney Center, LLC and Superior Home Health, L.L.C., and all documents and agreements executed in connection therewith.

18.    *Prepetition Liens*.    Prepetition Lender's asserted security interests in the Prepetition Collateral under the Prepetition Documents.

19.    *Priority Liens*.    Liens which are first priority, properly perfected, valid and enforceable security interests, which are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable nonbankruptcy law.

20.    *Replacement Liens*.    The "Replacement Liens," as that term is defined in the paragraph 4 of this Order.

21.    *Termination Date*.    At Postpetition Lender's election, the earlier to occur of:  (a) the date on which Postpetition Lender provides, via electronic mail, facsimile or

overnight mail, written notice to the Debtors, counsel for Debtors, counsel for any Committee and the Office of the United States Trustee of the occurrence and continuance of an Event of Default; and (b) the date on which a sale of all or substantially all of the Postpetition Collateral is consummated; and (c) December ___, 2013.

      22.    ***Trustee***. Any trustee appointed or elected in the Cases.

**EXHIBIT B**

**POSTPETITION DOCUMENTS**

## PROMISSORY (TERM) NOTE

July ___, 2013

Term Credit Amount:  $410,000.00

1.  FOR VALUE RECEIVED, on the Maturity Date, GARFIELD KIDNEY CENTER, LLC ("Garfield"), WEST SIDE COMMUNITY HOSPITAL, INC. ("Sacred Heart") and SUPERIOR HOME HEALTH, L.L.C. (together, "Borrowers" or "the undersigned") promise to pay to the order of BCL – M&E LLC, or its assigns ("Lender"), the sum of Four Hundred Ten Thousand and 00/100 Dollars ($410,000.00), or such lesser amount as may from time to time be outstanding, at the office of the Lender, or at such location as any legal holder hereof shall designate. In addition to the original amount of this Note, Borrowers shall pay the following:

(A) on the Maturity Date or the date the Loan is repaid in full, whichever is sooner, Borrowers shall pay Lender a commitment fee of $75,000.00 which fee is deemed fully earned on the date of this Note (the "Initial Term Commitment Fee"); and

(B) if the Extension Option (as defined below) is exercised, on the Maturity Date or the date the Loan is repaid in full, whichever is sooner, Borrowers shall pay Lender the Initial Term Commitment Fee plus a commitment fee of $30,000.00 for each month that Loan remains unpaid during the Extension Period (as defined below) which fees are deemed fully earned on the first day of each 30 period of the Extension Period (the "Extension Commitment Fee"); and

(C) upon the sale or refinance of any of the Properties (as defined in the Loan Agreement), Borrowers shall pay to Lender the net proceeds of such sale or refinance after all reasonable and customary closing costs have been paid; and

(D) upon the sale of the Sacred Heart assets, a payment of one half of the total amount that would be due under this Note at the Maturity Date; and

(E) upon the sale of the Garfield assets, a payment of one half of the total amount that would be due under this Note at the Maturity Date; and

(F)  on the Maturity Date, a payment shall be paid in the amount of the then remaining principal balance of this Note, plus all unpaid interest as of the date of such payment, plus all of Lender's fees and costs, if any.

2.  The unpaid principal amount from time to time outstanding on this Note shall bear interest upon the occurrence and continuance of an Event of Default (as defined in that certain Loan and Security Agreement dated the date of this Note by and between Borrowers and Lender (the "Loan Agreement")) as follows:  (i) immediately upon an Event of Default during the initial Term, in addition to the Initial Term Commitment Fee, Borrowers shall owe Lender $75,000.00 of default interest for the Initial Term which amount is deemed fully earned on the date of such Event of Default, with default interest of $50,000 for each 30 day period after the Initial Term, with the default interest having been deemed earned on the first day of each 30 day period after the Event of Default (if an Event of Default occurs during the Initial Term, subsection 2(ii) below shall not be applicable); and (ii) immediately upon an Event of Default after the Initial Term, in lieu of the Extension Commitment Fee, default interest of $50,000 shall be due for each 30 day period after the Event of Default, with the first $50,000 being deemed earned on the date of the Event of Default and all

subsequent default interest being deemed earned on the first day of each 30 day period following the Event of Default. Notwithstanding anything contained herein, upon the occurrence of an Event of Default, Lender may, in Lender's sole discretion, re-characterize any or all interest payments prior to such Event of Default as principal payments hereunder, and may apply any payments or proceeds from the liquidation of any collateral securing the Loan received after an Event of Default towards costs, expenses, principal or interest in any order as Lender, in its sole discretion, determines.

3. The term "Maturity Date" as used in this Note shall mean (A) if the Extension Option has not been exercised, October ___, 2013, and (B) if the Extension Option has been exercised, December ___, 2013. Except as provided in 1(C) – (E) above, Borrowers may prepay this Note in full only based upon the payoff amounts listed on the attached Schedule "A".

4. Borrowers and any endorsers and accommodation parties hereto hereby waive presentment, demand, notice of dishonor and protest. This Note evidences the Loan under the Loan Agreement and is the Note as defined in the Loan Agreement. The terms and provisions of the Loan Agreement are incorporated in their entirety into this Note by this reference. All terms not defined herein shall have the same meanings herein as in the Loan Agreement.

5. In the event Borrowers do not pay this Note in full on or before October __, 2013, and no other Events of Default (as defined in the Loan Agreement) have occurred or will occur with the giving of notice, the passage of time, or both, Borrowers shall be deemed to have exercised an option to extend the Maturity Date (the "Extension Option") for a period of two months (the "Extension Period") to December __, 2013.

6. Borrowers agree to pay (A) all out-of-pocket fees and expenses of Lender (including, but not limited to, fees and expenses of outside counsel to Lender and paralegals) in connection with the making and administration of the loan evidenced by this Note; and (B) following the occurrence of an Event of Default, all fees and out-of-pocket expenses of Lender (including, but not limited to, outside counsel to Lender) in connection with the enforcement of this Note and the Documents.

7. BORROWERS HEREBY IRREVOCABLY AUTHORIZE AND EMPOWER ANY ATTORNEY-AT-LAW TO APPEAR IN ANY COURT OF RECORD AND TO CONFESS JUDGMENT AGAINST BORROWERS FOR THE UNPAID AMOUNT OF THIS NOTE AS EVIDENCED BY AN AFFIDAVIT SIGNED BY AN OFFICER OF LENDER SETTING FORTH THE AMOUNT THEN DUE, PLUS ATTORNEYS' FEES AS PROVIDED IN THIS NOTE, PLUS COSTS OF SUIT, AND TO RELEASE ALL ERRORS, AND WAIVE ALL RIGHTS OF APPEAL. IF A COPY OF THIS NOTE, VERIFIED BY AN AFFIDAVIT, SHALL HAVE BEEN FILED IN THE PROCEEDING, IT WILL NOT BE NECESSARY TO FILE THE ORIGINAL AS A WARRANT OF ATTORNEY. BORROWERS WAIVE THE RIGHT TO ANY STAY OF EXECUTION AND THE BENEFIT OF ALL EXEMPTION LAWS NOW OR HEREAFTER IN EFFECT. NO SINGLE EXERCISE OF THE FOREGOING WARRANT AND POWER TO CONFESS JUDGMENT WILL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT ANY SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, VOIDABLE OR VOID; BUT THE POWER WILL CONTINUE UNDIMINISHED AND MAY BE EXERCISED FROM TIME TO TIME AS LENDER MAY ELECT UNTIL ALL AMOUNTS OWING ON THIS NOTE HAVE BEEN PAID IN FULL.

8. IN THE EVENT LENDER CHOOSES NOT TO EXERCISE ITS RIGHTS UNDER THE CONFESSION CLAUSE ABOVE, THE BORROWERS HEREBY IRREVOCABLY AND UNCONDITIONALLY:

IN WITNESS WHEREOF, the Borrower has executed and delivered this Promissory Note as of the date set forth above.

BORROWERS:

**SUPERIOR HOME HEALTH, L.L.C.**

By:_____
Its:

**GARFIELD KIDNEY CENTER, LLC**

By:_____
Its:

**WEST SIDE COMMUNITY HOSPITAL, INC.**

By: _____
Its:

**LOAN AND SECURITY AGREEMENT**

DATED AS OF

JULY ___, 2013

BY AND BETWEEN

**BCL-M&E LLC**

AND

**WEST SIDE COMMUNITY HOSPITAL, INC.**
**GARFIELD KIDNEY CENTER, LLC**
**SUPERIOR HOME HEALTH, L.L.C.**

<u>LOAN AND SECURITY AGREEMENT</u>

THIS LOAN AND SECURITY AGREEMENT (the "Agreement") is made as of July __, 2013 by and between BCL-M&E LLC (the "Lender") and WEST SIDE COMMUNITY HOSPITAL, INC. and its estate ("Sacred Heart"), GARFIELD KIDNEY CENTER, LLC and its estate ("Garfield"), SUPERIOR HOME HEALTH, L.L.C. and its estate ("Superior") (Sacred Heart, Superior and Garfield shall be referred to herein individually as a "Borrower" and together as the "Borrowers").

THE PARTIES HERETO agree as follows:

ARTICLE ONE.  <u>DEFINITIONS</u>

SECTION 1.01. <u>DEFINED TERMS</u>.  In addition to terms defined elsewhere in this Agreement or any Supplement or Exhibit hereto, when used herein, the following terms shall have the following meanings:

"<u>Account Debtor</u>" shall mean any Person who is or who may become obligated to a Borrower under, with respect to, or on account of an Account Receivable or other Collateral.

"<u>Accounts Receivable</u>" shall mean any and all accounts (as such term is defined in the UCC) of a Borrower and each and every right of a Borrower to (i) the payment of money or (ii) the receipt or disbursement of products, goods, services or other valuable consideration, whether such right now exists or hereafter arises, whether such right arises out of a sale, lease or other disposition of Inventory, or out of a rendering of services, or out of a policy of insurance issued or to be issued, or from a secondary obligation or arising out of the use of a credit or charge card or information contained on or for use with such card, incurred or to be incurred, or any other transaction or event, whether such right is created, generated or earned by a Borrower or by some other Person who subsequently transfers its interest to a Borrower, whether such right is or is not already earned by performance, and howsoever such right may be evidenced, together with all other rights and interests (including all liens and security interests) which such Borrower may at any time have by law or agreement against any Account Debtor or other Person obligated to make any such payment or against any property of such Account Debtor or other Person.

"<u>Avoidance Actions</u>" shall mean causes of actions and proceeds therefrom brought under Bankruptcy Code §§ 544, 545, 547, 548, 549, 550, 551, and 553.

"<u>Bankruptcy Code</u>" shall mean the United States Bankruptcy Code (11U.S.C. 101 et seq.) as amended, and any successor statute.

"<u>Business Day</u>" shall mean any day (other than a Saturday or Sunday) on which the Federal Reserve Bank of Chicago is open for business.

"<u>Closing Date</u>" shall mean the date upon which all of the terms and conditions of the Documents have been met or fulfilled to the satisfaction of the Lender.

"<u>Collateral</u>" shall mean the Sacred Heart Collateral, the Superior Collateral and the Garfield Collateral; provided, however, that the Collateral shall exclude $5,000,000.00 of cash securing a letter of credit issued by First Merit Bank N.A., life insurance policies on the lives of Ed Novak and Roy Payawal owned by Sacred Heart, and equipment that is the subject of a true lease or equipment subject to valid, enforceable and perfected security interests existing as of the date of this Agreement other than the liens of First Merit.

2

"DIP Orders" shall mean for Sacred Heart, Superior and Garfield, the order or orders entered by the bankruptcy court authorizing Sacred Heart, Superior and Garfield to obtain the Loan under the terms and conditions contained in this Loan Agreement.

"Documents" shall mean this Agreement, the Note, the Mortgages, and any other instruments or documents required or contemplated hereunder or thereunder, whether now existing or at any time hereafter arising.

"Equipment" shall mean all machinery and equipment owned by any of the Borrowers, wherever located, whether now owned or hereafter existing or acquired by such Borrower, any embedded software thereon, any additions thereon, accessions thereto or replacements of parts thereof.

"Garfield Collateral" shall mean all of the assets of Garfield, howsoever arising, wherever located and whether now owned or existing or hereafter existing or acquired whether arising from Section 552(b) of the Bankruptcy Code or otherwise, excluding Avoidance Actions including, but not limited to, the following:

(i)     all Equipment;

(ii)    all Accounts Receivable;

(iii)   all Inventory;

(iv)    any and all monies, reserves, deposits, deposit accounts, securities, cash, cash equivalents, balances, credits, and interest and dividends on any of the above, of or in the name of Garfield, now or hereafter with the Lender or any financial institution, and any and all other property of any kind and description of or in the name of Garfield, now or hereafter, for any reason or purpose whatsoever, in the possession or control of, or in transit to, the Lender or any agent or bailee for the Lender;

(v)     all chattel paper, whether tangible or electronic chattel paper, contract rights, letter of credit rights and instruments including, without limitation, all supporting obligations of any of the foregoing;

(vi)    all General Intangibles;

(vii)   all investment property;

(viii)  all furniture and fixtures;

(ix)    all documents of title and receipts, whether negotiable or non-negotiable, including all goods covered by such documents.

(x)     all books, records and computer records in any way relating to the above property;

(xi)    any and all substitutions, renewals, improvements, replacements, additions and proceeds of (i) through (x) above, including, without limitation, proceeds of insurance policies.

"Garfield Mortgage" shall mean that certain mortgage given by Garfield to Lender relating to the Garfield Property.

"Garfield Property" shall mean the real estate located at 3250 W. Franklin Avenue, Chicago, Illinois each as more specifically described on Exhibit A-1.

"General Intangibles" shall mean all general intangibles (as such term is defined in the UCC) owned by any Borrower, including, but not limited to payment intangibles, goodwill, software, trademarks, trade names, licenses, patents, patent applications, copyrights, inventions, franchises, books and records of any Borrower, designs, trade secrets, registrations, prepaid expenses, all rights to and payments of refunds, overpayments, rebates and return of monies, including, but not limited to, sales tax refunds, tax refunds, tax refund claims and rights to and payments of refunds, overpayments or overfundings under any pension, retirement or profit sharing plans and any guarantee, security interests or other security held by or granted to any Borrower to secure payment by an Account Debtor of any of the Accounts Receivable.

"Inventory" shall mean any and all goods, finished goods, whole goods, materials, raw materials, work-in-progress, components or supplies, wheresoever located and whether now owned or hereinafter acquired and owned by any Borrower, including, without limitation, goods, finished goods, whole goods, materials, raw materials, work-in-process, components or supplies in transit, wheresoever located, whether now owned or hereafter acquired by any Borrower, which are held for demonstration, illustration, sale or lease, furnished under any contract of service or held as raw materials, work-in-process for manufacturing or processing or supplies for manufacturing or processing, and all materials used or consumed in the business of any Borrower, and shall include such other property, the sale or disposition of which has given rise to an Accounts Receivable and which has been returned to or repossessed or stopped in transit by or on behalf of any Borrower, but shall not include property owned by third parties in the possession of any Borrower.

"Liabilities" shall mean all liabilities, indebtedness and obligations of Borrowers to the Lender, howsoever created, arising or evidenced, whether now existing or hereafter arising, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, primary or secondary, joint or several, whether existing or arising through discount, overdraft, purchase, direct loan, participation, operation of law, or otherwise, including, but not limited to, all liabilities, indebtedness and obligations of Borrowers to the Lender pursuant to any letter of credit, any standby letter of credit, or any of the Documents and reasonable outside attorneys' and paralegals' fees or charges relating to the preparation of the Documents and the enforcement of Lender's rights, remedies, powers and security interests under this Agreement, including, but not limited to, the drafting of any documents in the preparation and enforcement of the Loan.

"Loan" shall mean that certain term loan to Borrowers in the original principal amount of $410,000.00.

"Maturity Date" shall mean October __, 2013, or, if the Extension Option (as defined in the Note) is exercised, December __, 2013.

"Mortgage" and "Mortgages" shall mean have the meanings set forth in Section 3.02 of this Agreement.

"Note" shall mean that certain Term Note in the original principal amount of $410,000.00 dated the date of this Agreement.

4

"Park Place" shall mean Park Place, L.L.C., an Illinois limited liability company.

"Park Place Mortgage" shall mean that certain Mortgage given by Park Place to Lender relating to the Park Place Properties.

"Park Place Properties" shall mean the real estate located at 534 and 536 N. Kedzie Avenue, Chicago, Illinois all as more specifically described on Exhibit A-2.

"Permitted Indebtedness" shall mean (i) the Loan, and (ii) current accounts payable arising in the ordinary course of business, and pre-petition debt (including capital leases) of Sacred Heart and Garfield existing on the date each filed for bankruptcy.

"Permitted Liens" shall mean liens (i) for current taxes not delinquent or taxes being contested in good faith and by appropriate proceedings and for which adequate reserves have been established; (ii) arising in the ordinary course of business for sums not due or sums being contested in good faith and by appropriate proceedings and for which adequate reserves have been established, but not involving any deposits, advances or borrowed money or the deferred purchase price of property or services; (iii) in favor of Lender; (iv) liens against the Collateral in existence on the date of this Agreement which, by virtue of the DIP Orders have been subordinated to the liens of Lender granted herein; and (v) liens specifically permitted pursuant to this Agreement.

"Person" shall mean individually, and "Persons" shall mean collectively, any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether national, federal, state, county, city, municipal or otherwise including, without limitation, any instrumentality, division, agency, body or department thereof).

"Plans" shall mean the final working drawings and specifications, if any, together with any amendments or modifications thereto, for the construction of the Improvements, approved in writing by Lender, Borrowers, and any necessary governmental authority, but not including any changes made subsequent to submission thereof to Lender.

"Property" shall mean, individually, and "Properties" shall mean, collectively, each of the Park Place Properties, Sacred Heart Properties, Garfield Property, West Side Property and WSCH Property.

"Sacred Heart Collateral" shall mean all of the assets of Sacred Heart, howsoever arising, wherever located and whether now owned or existing or hereafter existing or acquired whether arising from Section 552(b) of the Bankruptcy Code or otherwise, but excluding Avoidance Actions, including, but not limited to, the following:

        (i)     all Equipment;

        (ii)    all Accounts Receivable;

        (iii)   all Inventory;

        (iv)   any and all monies, reserves, deposits, deposit accounts, securities, cash, cash equivalents, balances, credits, and interest and dividends on any of the above, of or in the name of Sacred Heart, now or hereafter with the Lender or any financial

institution, and any and all other property of any kind and description of or in the name of Sacred Heart, now or hereafter, for any reason or purpose whatsoever, in the possession or control of, or in transit to, the Lender or any agent or bailee for the Lender;

(v)     all chattel paper, whether tangible or electronic chattel paper, contract rights, letter of credit rights and instruments including, without limitation, all supporting obligations of any of the foregoing;

(vi)    all General Intangibles;

(vii)   all investment property;

(viii)  all furniture and fixtures;

(ix)    all documents of title and receipts, whether negotiable or non-negotiable, including all goods covered by such documents.

(x)     all books, records and computer records in any way relating to the above property;

(xi)    any and all substitutions, renewals, improvements, replacements, additions and proceeds of (i) through (x) above, including, without limitation, proceeds of insurance policies.

"Sacred Heart Mortgage" shall mean that certain mortgage given by Sacred Heart to Lender relating to the Sacred Heart Properties.

"Sacred Heart Properties" shall mean the real estate located at 520 and 522 N. Sawyer Avenue, Chicago, Illinois, and part of 3250 and 3256 W. Franklin Avenue, Chicago, Illinois each as more specifically described on Exhibit A-3.

"Superior Collateral" shall mean all of the assets of Superior, howsoever arising, wherever located and whether now owned or existing or hereafter existing or acquired whether arising from Section 552(b) of the Bankruptcy Code or otherwise, excluding Avoidance Actions including, but not limited to, the following:

(i)     all Equipment;

(ii)    all Accounts Receivable;

(iii)   all Inventory;

(iv)    any and all monies, reserves, deposits, deposit accounts, securities, cash, cash equivalents, balances, credits, and interest and dividends on any of the above, of or in the name of Superior, now or hereafter with the Lender or any financial institution, and any and all other property of any kind and description of or in the name of Superior, now or hereafter, for any reason or purpose whatsoever, in the possession or control of, or in transit to, the Lender or any agent or bailee for the Lender;

(v)     all chattel paper, whether tangible or electronic chattel paper, contract rights, letter of credit rights and instruments including, without limitation, all supporting obligations of any of the foregoing;

(vi)    all General Intangibles;

(vii)   all investment property;

(viii)  all furniture and fixtures;

(ix)    all documents of title and receipts, whether negotiable or non-negotiable, including all goods covered by such documents.

(x)     all books, records and computer records in any way relating to the above property;

(xi)    any and all substitutions, renewals, improvements, replacements, additions and proceeds of (i) through (x) above, including, without limitation, proceeds of insurance policies.

"UCC" shall mean the Uniform Commercial Code as enacted and amended in the State of Illinois, and as may be further amended from time to time.

"WSCH" shall mean West Side Community Hospital Limited Partnership, an Illinois limited partnership.

"WSCH Mortgage" shall mean that certain mortgage given by WSCH to Lender relating to the WSCH Property.

"WSCH Property" shall mean the real estate located at 538 N. Sawyer Avenue, Chicago, Illinois and 518 N. Kedzie Avenue, Chicago, Illinois each as more specifically described on Exhibit A-5.

"West Side" shall mean West Side Management Corporation, an Illinois corporation.

"West Side Mortgage" shall mean that certain mortgage given by West Side to Lender relating to the West Side Property.

"West Side Property" shall mean the real estate located at 548 N. Kedzie Avenue, Chicago, Illinois as more specifically described on Exhibit A-5.

## ARTICLE TWO.  LOANS

SECTION 2.01.LOAN AMOUNT.  Subject to the terms and conditions of this Agreement, and only upon the entry of the  DIP Orders, commencing on the Closing Date, the Lender agrees to make a term loan in the principal amount of $410,000.00 to be made on the Closing Date.   Notwithstanding anything else contained herein, the Loan shall not be increased without the consent of WSCH, Park Place, and West Side.

SECTION 2.02.USE OF LOAN PROCEEDS. Four Hundred Thousand Dollars ($400,000.00) of the Loan shall be used by Borrowers for operating capital and Ten Thousand Dollars ($10,000.00) of the Loan shall be used to pay the Lender's closing fees and expenses, including attorneys fees, connected to the Loan.

SECTION 2.03.TERM NOTE.  The Loan shall be evidenced by the Note, in form and manner satisfactory to Lender, dated the date first above written, payable to the order of Lender in the maximum principal amount of the Loan. The Loan shall bear interest and be payable as set forth in the Note. Borrowers may from time to time prepay the Note in whole or in any part only in accordance with the terms and provisions of the Note.

## ARTICLE THREE.  COLLATERAL

SECTION 3.01.SECURITY INTERESTS.   To secure payment of the Liabilities, Borrowers hereby irrevocably pledge, assign, transfer, convey and set over to the Lender and hereby grant to the Lender a first and paramount security interest in and to the Collateral, howsoever arising, wherever located and whether now owned or existing or hereafter existing or acquired.

SECTION 3.02.MORTGAGES.  To secure the payment of all of the Liabilities, Borrowers shall execute and deliver, or cause to be executed, to Lender the Garfield Mortgage, the Sacred Heart Mortgage, the West Side Mortgage, WSCH Mortgage and the Park Place Mortgage (individually, a "Mortgage" and collectively, the "Mortgages").

SECTION 3.03.PLEDGE.  To secure payment of the Liabilities, Borrowers hereby irrevocably pledge, assign, transfer, convey and set over to the Lender and hereby grants to Lender a senior lien and security interest in the following property of Borrowers whether now existing or hereafter acquired:  any and all monies, reserves, deposits, deposit accounts, securities, cash, cash equivalents, balances, credits, and interest and dividends on any of the above, of or in the name of any Borrower, now or hereafter with the Lender and any and all other property of any kind and description of or in the name of any Borrower, now or hereafter, for any reason or purpose whatsoever, in the possession or control of, or in transit to, the Lender or any agent or bailee for the Lender; and any and all substitutions, renewals, improvements, replacements, additions and proceeds of any of the above, including, without limitation, proceeds of insurance policies.

SECTION 3.04.FURTHER ASSURANCES. Borrowers shall perform any and all acts reasonably requested by the Lender to establish, maintain and continue Lender's security interest and mortgage in and to the Properties, including, but not limited to, executing or authenticating financing statements and such other instruments and documents as may be reasonably requested by Lender. Borrowers hereby authorize Lender through any of Lender's employees, agents or attorneys to file any and all financing statements, including, without limitation, any continuations, transfers or amendments thereof required to perfect Lender's security interest and mortgage in and to the Properties and any other collateral which

8

may now or hereafter be pledged to Lender under the Uniform Commercial Code without authentication or execution by Borrowers.

SECTION 3.05. CROSS COLLATERALIZATION/SALE OF EQUIPMENT. The Borrowers acknowledge and agree that (A) the Properties and the Collateral secure all of the Liabilities; and (B) Lender shall not release any lien on any portion of the Properties, unless and until all the Liabilities are paid in full; provided, however, (i) Lender hereby agrees to release its liens against the Sacred Heart Collateral upon a sale of the Sacred Heart Collateral and payment to Lender of 50% of the balance of the Liabilities and (ii) Lender agrees to release its lien against the Garfield Collateral upon a sale of the Garfield Collateral and payment to Lender of 50% of the balance of the Liabilities; provided, further that absent a sale of all of the assets of Sacred Heart and/or Garfield to one buyer in a going concern sale and a complete payoff of the Liabilities hereunder, the sale of the Sacred Heart Collateral consisting of Equipment must be conducted by The Ettin Group, LLC ("TEG") pursuant to the terms and conditions of an Auction Agreement by and between TEG and Sacred Heart and the sale of any Garfield Collateral consisting of Equipment must be conducted by TEG pursuant to the terms and conditions of an Auction Agreement by and between TEG and Garfield.

SECTION 3.06. COLLECTION OF ACCOUNTS RECEIVABLE.

(A)    (i) Lender, at any time after the occurrence of an Event of Default, or any event which, with the giving of notice, the passage of time, or both, would result in an Event of Default, may, in its sole discretion, notify any or all of the Account Debtors that (1) the Accounts Receivable have been assigned to the Lender; and/or (2) that all further payments on the Accounts Receivable should be paid solely to the Lender. When requested by the Lender after the occurrence of an Event of Default, Borrower at its expense will notify or cause to be notified any or all Account Debtors to pay directly to the Lender any sum or sums then due or to become due on the Accounts Receivable or any part thereof and all bills and statements thereafter sent by Borrower to such Account Debtors shall state that the same have been assigned to the Lender and are payable solely to the Lender;

(ii)    In the event one or more Events of Default have occurred under the terms of this Agreement, the Lender shall have and succeed to all rights, remedies, securities and liens of Borrower in respect to such Accounts Receivable or other Collateral, and shall have the right to enforce the same in its name or to direct the enforcement thereof by Borrower for the benefit of the Lender, and Borrower shall, at the request of the Lender, deliver to the Lender a separate written assignment of any of the same. The Lender, however, shall not incur any obligation or liability of Borrower to any Account Debtor, including, but not limited to, obligations or liabilities pursuant to any contract, agreement, warranty, guarantee, judicial decree or jury award. The Lender, in such an event, is also hereby irrevocably authorized to receive, open and dispose of all mail addressed to Borrower, to notify the Post Office authorities to change the address for delivery of Borrower's mail to an address designated by the Lender, to endorse Borrower's name on all notes, checks, drafts, bills of exchange, money orders, commercial paper of any kind whatsoever, and any other instruments or documents received howsoever in payment of the Accounts Receivable, or any part thereof, and the Lender or any officer or employee thereof is hereby irrevocably constituted and appointed agent and attorney-in-fact for Borrower for the foregoing purpose;

(iii)    Borrower shall not collect, compromise or accept any sum in full payment or satisfaction of any of the Accounts Receivable for materially less than the amount due without the express written consent of the Lender, except in the ordinary course of business; and

SECTION 3.07. USE OF COLLATERAL. Borrower shall at all times keep the Collateral in good condition and repair and free and clear of all unpaid charges (including, but not limited to, taxes), liens

and encumbrances (except Permitted Liens), and shall pay or cause to be paid all post petition obligations as they come due, including but not limited to, mortgage payments, real estate taxes, assessments and rent due on the premises where the Collateral is or may be located, except for charges, liens, encumbrances and obligations being contested in good faith by Borrower and for which adequate reserves have been established. Borrower agrees that (except as provided in the immediately preceding sentence) in the event Borrower fails to pay such obligations, the Lender may, at its sole and arbitrary discretion, pay such obligations for the account of Borrower. The Lender may, in its sole discretion, discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral and may, in its sole and arbitrary discretion, pay for the maintenance and preservation of the Collateral. Any payments made by the Lender pursuant to this Section shall be repayable to the Lender by Borrower immediately upon the Lender's demand therefor, with interest at a rate equal to the highest interest rate described in the Note in effect from time to time during the period from and including the date funds are so expended by the Lender to the date of repayment, and any such amounts due and owing the Lender shall be an additional obligation of Borrower to the Lender secured hereunder.

## ARTICLE FOUR.  REPRESENTATIONS AND WARRANTIES

SECTION 4.01.Borrowers each represent and warrant to the Lender that:

(A)    Organization, Etc. It is duly organized, validly existing and in good standing (or will become in good standing by paying annual fees) under the laws of the State of Illinois and is duly qualified and in good standing or has applied for qualification as a foreign limited liability company authorized to do business in each jurisdiction where, because of the nature of its activities or properties, such qualification is required.

(B)    Authorization: No Conflict.  Upon entry of the DIP Orders, execution and delivery of the Documents are all within the  powers of it, have been duly authorized by all necessary action, have, or by the time of their execution and delivery shall have, received all necessary governmental or regulatory approval (if any shall be required), and do not and will not contravene or conflict with any provision of (i) law, rule, regulation or ordinance; (ii) the organizational documents of Borrowers; or (iii) any agreement binding upon it or any of its properties, as the case may be, except agreements currently in place with First Merit Bank, N.A.

(C)    Validity and Binding Nature.  The Documents executed by it are the legal, valid and binding obligations of it, enforceable against it, in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization and other similar laws of general application affecting the rights and remedies of creditors and except as the availability of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.

(D)    Liens.  Upon entry of the DIP Orders, Lender shall have the senior lien on the Collateral and upon execution and recordation of the Mortgages, the senior mortgage lien against the Properties.

(E)    No Violations of Laws.  It (i) is not in material violation of any law, ordinance, rule, regulation, judgment, decree or order of any federal, state or local governmental body or court; and (ii) has obtained all required permits, certificates, licenses, approvals and other authorizations from governmental agencies and entities (whether federal, state or local) necessary to carry on its operation.

10

## ARTICLE FIVE.  COVENANTS

SECTION 5.01. BORROWERS.  Until all the Liabilities are paid in full, Borrowers covenant and agree that:

(A)     Financial Statements and Certificates.  Upon Lender's request, it will furnish to the Lender (i) copies of all federal and state tax returns of Borrowers, including, but not limited to, requests for extensions of such tax returns, when and as filed; (ii) a current financial statement; and (iii) such other information as the Lender from time to time reasonably requests.

(B)     Insurance.  It will maintain all insurance as required in the Mortgages and such other insurance to the extent and against such hazards and liabilities as is customarily maintained by entities similarly situated.  All policies evidencing such insurance shall provide that they cannot be canceled, amended or terminated unless at least 30 days prior written notice has been given to Lender.

(C)     Books, Records and Inspections.  It will (i) maintain complete and accurate books and records; (ii) permit reasonable access by the Lender to the books and records of it; and (iii) permit the Lender, upon reasonable notice, to inspect the Properties, whether real or personal.

(D)     Indebtedness.  It will not incur or permit to exist any indebtedness or liability for borrowed money or for the deferred purchase price of any property or any services, except for Permitted Indebtedness.

(E)     Liens.  It will not create or permit to exist any mortgage, pledge, title retention lien, or other lien, encumbrance or security interest with respect to any assets now owned or hereafter acquired and owned, except for Permitted Liens.

(F)     Guaranties, Loans or Advances.  It will not become or be a guarantor or surety of, or otherwise become or be responsible in any manner with respect to any undertaking of any other Person, or make or permit to exist any loans or advances to any other Person, except for the endorsement, in the ordinary course of collection, of instruments payable to it or to its order.

(G)     Violation of Law.  It will not materially violate any law, statute, ordinance, rule, regulation, judgment, decree, order, writ or injunction of any federal, state or local authority, court, agency, bureau, board, commission, department or governmental body.

(H)     Maintenance of Business.  It will preserve its existence in the jurisdiction of establishment, as that may be from time to time, and it will not operate in any business other than a business substantially the same as the business of it as in effect on the date of this Agreement.

(I)     Chief Restructuring Officer.   Garfield and Sacred Heart shall continue the retention of Paul Rundell (or such successor as approved by Lender in its sole discretion) as the Chief Restructuring Officer at all times until the Liabilities have been paid in full.

(J)     Chapter 11 Claims.  It will not incur, create, assume, suffer to exist or permit any other super-priority claim which is pari passu with or senior to the claims and liens of Lender.

## ARTICLE SIX. <u>EVENTS OF DEFAULT</u>

SECTION 6.01. <u>EVENTS OF DEFAULT</u>. Each of the following acts, occurrences or omissions shall constitute an event of default under this Agreement (herein referred to as an "Event of Default"), whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment or order of any court or any order, rule or regulation of any governmental or nongovernmental body or tribunal:

      (A)    Borrowers shall default in the payment when due of any amount due and owing to the Lender under the Note; or

      (B)    Any representation or warranty made by Borrowers contained in the Documents shall at any time prove to have been incorrect in any material respect when made; or

      (C)    Borrowers shall default in the performance or observance of any term, covenant, condition or agreement on its part to be performed or observed under the Documents; or

      (D)    The Chapter 11 case of either Sacred Heart or Garfield shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or

      (E)    An order shall be entered by the bankruptcy court in the Sacred Heart or Garfield bankruptcy approving any (i) claims for recovery of amounts under 506(c) of the Bankruptcy Code arising from the preservation or disposition of any Collateral; or (ii) other administrative expense claim having priority over, or being pari-passu with the repayment of the Liabilities; or

      (F)    An order shall be entered by the bankruptcy court  in the Sacred Heart or Garfield bankruptcy granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder of any security interest (other than Lender) in any Collateral of any Borrower allowing such creditor to foreclose or otherwise realize upon any such security interest in any Collateral of any Borrower; or

      (G)    Without Lender's consent, an order shall be entered by the bankruptcy court  in the Sacred Heart or Garfield bankruptcy or any other court amending, supplementing, staying, reversing, revoking, rescinding or otherwise modifying any of the DIP Orders, this Agreement or any of the Documents; or

      (H)    An order shall be entered by the bankruptcy court  in the Sacred Heart, Superior or Garfield bankruptcy or other court granting any lien or security interest (other than a Permitted Lien) in any Collateral of any Borrower in favor of any party other than Lender or granting a super-priority lien to any other party other than Lender that is pari-passu with or senior to the liens of Lender against the Collateral; or

      (I)    Any Borrower shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other Person's motion as to any of the matters set forth in paragraphs D-H above; or

      (J)    Any interim DIP Order shall cease to be in full force and effect without a new interim DIP Order or without the respective final DIP Order having been entered or deemed to have been entered prior to such cessation, or the entry of a final DIP Order shall not have occurred in each of the Sacred Heart, Superior and Garfield bankruptcies within 30 days after the petition date for each respective

Borrower, or any final DIP Order shall cease to be in full force and effect or Borrower's authority to borrower funds hereunder shall otherwise have terminated; or

(K)    Borrower shall fail to comply with the terms of any of the DIP Orders; or

(L)    Borrower shall seek to or shall support any other Person's motion to disallow or subordinate in whole or in part any of the Liabilities or to challenge the validity, enforceability, perfection or priority of Lender's liens against the Collateral or Properties; or

(M)    If notice is given that any Property, or any part of any Property, is subject to foreclosure, levy, attachment, seizure, or confiscation or uninsured loss; provided, however, that the deductible amount on any insurance policy currently in effect on any Property shall not be considered an uninsured loss pursuant to this Subsection; or

(N)    Any Borrower shall be dissolved, whether voluntarily or involuntarily and such Person has not taken all actions required to become reinstated;

## ARTICLE SEVEN.  REMEDIES

SECTION 7.01.REMEDIES UPON DEFAULT.  Upon the occurrence and continuance of any Event of Default, and the expiration of any applicable cure period, and in every such event:

(A)    The automatic stay in the bankruptcy of any Borrower shall automatically terminate with respect to Lender, the Collateral and the Properties pursuant to the terms of the DIP Order; and

(B)    notwithstanding anything in the Documents, Lender may, in its sole and arbitrary discretion, declare the principal of and interest on the Loan, the Note, and all other amounts owed under the Documents, to be forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived; and

(C)    Lender may require Borrowers to make the Properties, the Collateral and the records pertaining to the Properties and Collateral available to the Lender at a place designated by the Lender which is reasonably convenient or may take repossession of the Properties, the Collateral and the records pertaining to the Properties and Collateral without the use of any judicial process and without any prior notice thereof to Borrowers; and

(D)    Lender may foreclose on any or all of the Properties; and

(E)    Lender may conduct a sale under the Uniform Commercial Code of any or all of the Collateral from any Borrower's location upon at least 10 days notice to all interested parties and Borrowers agree that TEG may be used for such liquidation sale; and

(F)    Lender may exercise all of its rights and remedies against the Borrowers under applicable law and the Documents as long as such exercise of rights and remedies is consistent with the respective DIP Order.

SECTION 7.02.ATTORNEY-IN-FACT.  Upon the occurrence and during the continuation of an Event of Default, Borrowers hereby appoint Lender as such Person's attorney-in-fact, with full authority

in such Person's place and stead and in such Person's name or otherwise, from time to time in Lender's sole and arbitrary discretion, to take any action and to execute any instrument which Lender may deem necessary or advisable to accomplish the purpose of this Agreement and the Documents, including, but not limited to, the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others, employ security guards to protect the Collateral and/or the Properties from injury, complete renovation of the Properties if necessary; to retain or employ new contractors, architects and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims, which may be or become liens or security interests or to avoid such bills and claims becoming liens against the Properties, as may be necessary or desirable for the completion of the Properties or for the clearance of title; to execute all applications and certificates in the name of Borrowers which may be required by any pertinent document; and to do any and every act which Borrowers might do in its own behalf; to execute instruments of release and satisfaction; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked. Notwithstanding the foregoing authorization, Lender shall have no duty or obligation whatsoever with respect thereto.

SECTION 7.03. REMEDIES ARE SEVERABLE AND CUMULATIVE.   All provisions contained herein pertaining to any remedy of the Lender shall be and are severable and cumulative and in addition to all other rights and remedies available in the Documents, at law and in equity, any one or more may be exercised simultaneously or successively.   Any notification required pursuant to this Article Seven or under applicable law shall be reasonably and properly given to Borrowers at the address and by any of the methods of giving such notice as set forth in Section 8.03 of this Agreement.

ARTICLE EIGHT.  MISCELLANEOUS

SECTION 8.01. NO WAIVER; MODIFICATIONS IN WRITING.   No failure or delay on the part of Lender in exercising any right, power or remedy pursuant to the Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.   No amendment, modification, supplement, termination or waiver of any provision of the Documents, nor any consent by Lender to any departure by Borrowers therefrom, shall be effective unless the same shall be in writing and signed by Lender.   Any waiver of any provision of the Documents and any consent by Lender to any departure by Borrowers from the terms of any provision of the Documents shall be effective only in the specific instance and for the specific purpose for which given.   No notice to or demand on Borrowers in any case shall entitle Borrowers to any other or further notice or demand in similar or other circumstances.

SECTION 8.02. SET-OFF.   Lender shall have the right to set-off, appropriate and apply toward payment of any of the Liabilities, in such order of application as Lender may from time to time and at any time elect, any cash, credit, deposits, accounts, securities and any other property of Borrowers which is in transit to or in the possession, custody or control of Lender, or any agent, bailee, or Affiliate of Lender. Borrowers hereby grant to Lender a security interest in all such property.

SECTION 8.03. NOTICES, ETC.   All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto shall be in writing personally delivered or sent by overnight courier or by facsimile machine, and shall be deemed to be given for purposes of this Agreement on the day that such writing is delivered or sent by facsimile machine or one (1) day after such notice is sent by overnight courier to the intended recipient thereof in accordance with the provisions of this Section 8.03. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this Section 8.03 of this Agreement, notices, demands, instructions and

14

other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses indicated for such party below:

If to the Borrowers:

_____
_____
_____
Phone: _____
Fax No.: _____

With a copy to:

_____
_____
_____
Attention: _____
Phone - _____
Fax - _____

If to the Lender:

BCL-M&E LLC
450 Skokie Blvd., 600 Building
Northbrook, Illinois 60062
Attention:  Elan Peretz
Phone:  (847) 656-1112
Fax No.:  (847) 919-3813

With a copy to:

William S. Schwartz, Esq.
Levenfeld Pearlstein, LLC
400 Skokie Boulevard
Suite 700
Northbrook, Illinois 60062
Phone:  (847) 881-2122
Fax No. (312) 346-8434

SECTION 8.04. <u>COSTS, EXPENSES AND TAXES</u>.  Borrowers agree to pay (A) all out-of-pocket fees and expenses of Lender (including, but not limited to, UCC Filing and Search Fees and fees and expenses of outside counsel to Lender and paralegals) in connection with the making of the Loan and preparation of the Documents through the Closing Date; and (B) all fees and out-of-pocket expenses of Lender (including, but not limited to, outside counsel to Lender) in connection with the administration and enforcement of the Documents and the Loan. In addition, Borrowers shall pay any and all stamp, transfer and other taxes payable or determined to be payable in connection with the execution and delivery of the Documents and agrees to hold the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes.  If any suit or proceeding arising from any of the foregoing is brought against Lender, Borrowers, to the extent and in the manner directed by Lender, will resist and defend such suit or proceeding or cause the same to be resisted and defended by counsel approved by Lender.  If Borrowers shall fail to do any act or thing which it has covenanted to do under this Agreement or any representation or warranty on the part of Borrowers contained in this Agreement shall be breached, Lender may, in its sole and arbitrary discretion, after 3 days written notice is sent to Borrowers, do the same or cause it to be done or remedy any such breach, and may expend its funds for such purpose; and any and all amounts so expended by the Lender shall be repayable to the Lender by Borrowers immediately upon the Lender's demand therefor, with interest at a rate equal to the highest interest rate set forth in the Note in effect from time to time during the period from and including the date funds are so expended by Lender to the date of repayment, and any such amounts due and owing Lender shall be deemed to be part of the Liabilities secured hereunder. The

obligations of Borrowers under this Section shall survive the termination of this Agreement and the discharge of the other obligations of Borrowers under the Documents.

SECTION 8.05. COMPUTATIONS. Where the character or amount of any asset or liability or item of income or expense is required to be determined, or any consolidation or other accounting computation is required to be made, for the purpose of this Agreement, such determination or calculation shall, to the extent applicable and except as otherwise specified in this Agreement, be made in accordance with generally accepted accounting principles applied on a basis consistent with those at the time in effect.

SECTION 8.06. FURTHER ASSURANCES. Borrowers agree to do such further acts and things and to execute and deliver to Lender such additional assignments, agreements, powers, documents and instruments as Lender may reasonably require or deem advisable to carry into effect the purposes of the Documents, or to confirm unto Lender its rights, powers and remedies under the Documents.

SECTION 8.07. COUNTERPARTS; SIGNATURES. This Agreement may be executed in any number of counterparts, each of which counterparts, once they are executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same agreement. This Agreement and the Documents may be executed by any party to this Agreement or any of the Documents by original signature, facsimile and/or electronic signature.

SECTION 8.08. BINDING EFFECTS; ASSIGNMENT. Upon entry of the DIP Orders, this Agreement shall be binding upon, and inure to the benefit of, Lender, Borrowers and their respective successors, assigns, representatives and heirs. Borrowers shall not assign any of their rights nor delegate any of their obligations under Documents without the prior written consent of Lender and no such consent by Lender shall, in any event, relieve Borrowers of any of their obligations under the Documents.

SECTION 8.09. HEADINGS. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision of this Agreement and shall not affect the construction of this Agreement.

SECTION 8.10. ENTIRE AGREEMENT. This Agreement, together with the Documents, and the DIP Orders, contains the entire agreement between the parties hereto with respect to the transactions contemplated herein and supersede all prior representations, agreements, covenants and understandings, whether oral or written, related to the subject matter of the Agreement. Except as specifically set forth in this Agreement, Lender makes no covenants to Borrowers, including, but not limited to, any other commitments to provide any additional financing to Borrowers.

SECTION 8.11. GOVERNING LAW. This Agreement and all other Documents shall be deemed to be a contract made under the laws of the State of Illinois and for all purposes shall be construed in accordance with the laws of the State of Illinois, and, to the extent applicable, the Bankruptcy Code.

SECTION 8.12. SEVERABILITY OF PROVISIONS. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 8.13. CONFLICT. In the event of any conflict between this Agreement and any of the other Documents, the terms and provisions of this Agreement shall govern and control. In the event of any conflict between this Agreement or any of the Documents and any DIP Order, the terms and provisions of the DIP Order shall govern and control.

SECTION 8.14.<u>CUSTOMER IDENTIFICATION - USA PATRIOT ACT NOTICE; OFAC AND BANK SECRECY ACT</u>.  Lender hereby notifies Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act"), and Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies Borrowers, which information includes the name and address of Borrowers and such other information that will allow Lender to identify Borrowers in accordance with the Act.  In addition, Borrowers shall (a) ensure that no person who owns a controlling interest in or otherwise controls Borrowers or any subsidiary of Borrowers is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling  statute or Executive Order relating thereto, and (c) comply, and cause any of its subsidiaries to comply, with all applicable Bank Secrecy Act ("BSA") laws and regulations, as amended.

SECTION 8.15. <u>JURISDICTION; WAIVER</u>.  BORROWERS ACKNOWLEDGE THAT THIS AGREEMENT IS BEING SIGNED BY THE LENDER IN PARTIAL CONSIDERATION OF LENDER'S RIGHT TO ENFORCE IN THE JURISDICTION STATED BELOW THE TERMS AND PROVISION OF THIS AGREEMENT AND THE DOCUMENTS.  BORROWERS CONSENT TO JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES AND WAIVE ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND ANY OBJECTION THAT SAID COUNTY IS NOT CONVENIENT.  BORROWERS WAIVE ANY RIGHTS TO COMMENCE ANY ACTION AGAINST LENDER IN ANY JURISDICTION EXCEPT THE AFORESAID COUNTY AND STATE.  LENDER AND BORROWERS HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY WITH RESPECT TO ANY MATTER WHATSOEVER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE LOAN, THE DOCUMENTS AND/OR THE TRANSACTIONS WHICH ARE THE SUBJECT OF THE DOCUMENTS.

SECTION 8.16. <u>NONRECOURSE DEBT</u>.  Notwithstanding anything to the contrary contained herein, the Liabilities shall be non-recourse to Park Place, WSCH and West Side and Lender's recoveries with respect to each shall be limited to the Park Place Properties, WSCH Properties and West Side Property, respectively, and the rents, profits, license fees and proceeds thereof.

**[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered at Chicago, Illinois as of the date first above written.

BORROWERS:                          **SUPERIOR HOME HEALTH, L.L.C.**


By:_____
Its:


**GARFIELD KIDNEY CENTER, LLC**


By:_____
Its:

**WEST SIDE COMMUNITY HOSPITAL, INC.**


By:_____
Its:



LENDER:                             **BCL-M&E LLC**


By: _____
Title: _____

18

**EXHIBIT A-1**
**LEGAL DESCRIPTION**
**Garfield Property**

LOTS 14 TO 17, INCLUSIVE, AND THE WEST 5.50 FEET OF LOT 18 IN HAMBLETON'S SUBDIVISION OF THE WEST 1/2 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

Permanent Index Number:  16-11-222-029-0000

Property Address:  3250 W. Franklin Boulevard, Chicago, IL 60624

## EXHIBIT A-2
## LEGAL DESCRIPTION
### Park Place Properties

LOT 6 AND 7 IN THE SUBDIVISION OF THE EAST ½ OF THE NORTHEAST ¼ OF THE SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 16-11-223-027-0000 and 16-11-223-026-0000.

Commonly known as: 534 AND 536 N. KEDZIE, CHICAGO, ILLINOIS

## EXHIBIT A-3
## LEGAL DESCRIPTION
### Sacred Heart Properties

LOT 2 AND THE NORTH 8 FEET OF VACATED ALLEY LYING SOUTH OF SAID LOT 2 IN PETERSON'S RESUBDIVISION OF LOTS 25, 26, AND 27 IN HAMBLETON'S SUBDIVISION OF THE WEST ½ OF THE NORTHEAST ¼ OF THE SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN:16-11-222-020-0000

Commonly known as: 520 N. SAWYER AVE., CHICAGO, ILLINOIS

LOT 1 IN PETERSON'S RESUBDIVISION OF LOTS 25, 26, AND 27 IN THE SUBDIVISION OF THE WEST 1/2 OF THE NORTHEAST ¼ OF THE SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 16-11-222-019-0000

Commonly known as: 522 N. SAWYER AVE., CHICAGO, ILLINOIS

ALL BUT THE WEST 5.50 FEET OF LOT 18 AND LOTS 19 TO 24, INCLUSIVE, IN HAMBLETON'S SUBDIVISION OF THE WEST 1/2 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

PIN: 16-11-222-029-0000

Property Address:  3256 W. Franklin Boulevard, Chicago, IL 60624

Parcel 2

LOTS 15-25, BOTH INCLUSIVE, IN THE SUBDIVISION OF THE EAST 1/2 OF THE NORTH EAST 1/4 OF THE SOUTH EAST 1/4 OF THE NORTH EAST 1/4 OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

PIN: 16-11-223-050-0000

Property Address:  3250 W. Franklin Boulevard, Chicago, IL 60624

21

**EXHIBIT A-4**

## LEGAL DESCRIPTION
## West Side Property

LOT 1 IN D. FRANKLIN ANDERSON'S SUBDIVISION OF LOTS 1 TO 4 AND 36 TO 39, BOTH INCLUSIVE, IN SUBDIVISION OF THE EAST ½ OF THE NORTHEAST ¼ OF THE SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 16-11-223-020-0000

Commonly known as: 548 N. KEDZIE, CHICAGO, ILLINOIS

**EXHIBIT A-5**
**LEGAL DESCRIPTION**
**WSCH Property**

LOT 14 IN THE SUBDIVISION OF THE EAST ½ OF THE NORTHEAST ¼ OF THE SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 16-11-223-034-0000

Commonly known as: 518 N. KEDZIE, CHICAGO, ILLINOIS

LOT 33 AND THE SOUTH 13 FEET OF LOT 34 IN HAMBLETON'S SUBDIVISION OF THE WEST ½ OF THE NORTHEAST ¼ OF THE SOUTHEAST ¼ OF THE NORTHEAST ¼ OF SECTION 11, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH 125 FEET TAKEN FOR BOULEVARD), IN COOK COUNTY, ILLINOIS.

PIN: 16-11-222-027-0000

Commonly known as: 538 N. SAWYER AVE., CHICAGO, ILLINOIS